**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **CHAPTER 11** |
| **SOUTH TEXAS OIL COMPANY,** *et.al.,* | § | |
| | § | **CASE NO. 09-54233-LMC** |
| **Debtors.** | § | |
| | § | **Jointly Administered** |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11**
**U.S.C. SECTIONS 105, 361, 362, 364 AND 507 AND FEDERAL RULES OF**
**BANKRUPTCY PROCEDURE 2002, 4001 AND 9014 (I) AUTHORIZING THE**
**DEBTORS TO INCUR POSTPETITION SENIOR SECURED SUPERPRIORITY**
**INDEBTEDNESS; (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY**
**CLAIMS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE**
**AUTOMATIC STAY; AND (V) SCHEDULING A FINAL HEARING ON THE MOTION**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

South Texas Oil Company, Southern Texas Oil Company, STO Operating Company (Debtor in case No. 09-12573-cag originally filed on September 11, 2009 as an Involuntary Case under Chapter 7 in the Austin Division and now consolidated with STO Operating Company (Debtor as case No. 09-54390 in the San Antonio Division under Chapter 11), STO Properties LLC and STO Drilling Company (collectively, the "Debtors")[1], (collectively, the "Debtors"), the Debtors in the above captioned cases (the "Cases"), hereby file this *Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507 and Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014 (I) Authorizing the Debtors to Incur Postpetition Senior Secured Superpriority Indebtedness; (II) Granting Security Interests and Superpriority Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; and (V) Scheduling a Final Hearing on the Motion* (the "DIP Motion") and in

---

[1] The debtors in these chapter 11 cases are South Texas Oil Company, Southern Texas Oil Company, STO Operating Company (, STO Properties LLC and STO Drilling Company.

support of this Motion, the Debtors respectfully represent as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    PROCEDURAL BACKGROUND

2.    On October 30, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

3.    The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No creditors' committee has been appointed in these Cases by the United States Trustee. Further, no trustee or examiner has been requested or appointed.

4.    The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure.

5.    A motion requesting the joint administration of the Debtors' estates has been allowed by this Court.

6.    A further description of the background of the Debtors and the events leading up

to the filing of the voluntary petitions by the Debtors, is provided in the Declaration of Albert S. Conly in Support of First Day Pleadings, which is incorporated by reference herein.

### III.  FACTUAL BACKGROUND

**A.  Prepetition Loans and Liens.**

1.      Prior to the Petition Date, The Longview Fund, L.P. ("Longview"), and Longview Marquis Master Fund, L.P. ("Marquis") made certain loans and other financial accommodations available to South Texas Oil Company (the "Borrower") pursuant to certain senior notes (as amended, restated, supplemented, or otherwise modified from time to time, the "Initial Notes") issued in connection with that certain Securities Purchase Agreement dated April 1, 2008 between the Borrower Longview and Marquis and together with all instruments, agreements, and documents related thereto or executed in connection therewith (collectively, as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "Initial Loan Documents").  Pursuant to the Initial Loan Documents, Longview and Marquis agreed to provide Borrower with a credit facility of $32,500,000.

2.      Pursuant to that certain Securities Purchase Agreement dated September 19, 2008, between Borrower and Marquis, Borrower issued to Marquis a senior note (as amended, restated, supplemented, or otherwise modified from time to time, the "Bridge Note") in an original principal amount of $7,000,000 and together with all instruments, agreements, and documents related thereto or executed in connection therewith (collectively, as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "Bridge Loan Documents" and together with the Initial Loan Documents, the "Prepetition Documents").

On May 18, 2009, the Borrower completed a debt restructuring with Longview after which the Borrower had no remaining note payable or related accrued interest payable balances with Longview under the Initial Loan Documents.

3.      On May 29, 2009, Marquis provided the Borrower with notice that Marquis had transferred approximately 25% of each of the Initial Notes and Bridge Note it held, along with certain other rights and interests, to Summerview Marquis Fund, L.P. ("Summerview" and together with Marquis, the "Prepetition Lenders").

4.      The Debtors represent, stipulate, acknowledge, and agree that as of the Petition Date, the Borrower was indebted to the Prepetition Lenders under the Initial Loan Documents in the approximate aggregate principal amount of $9,673,504 and under the Bridge Loan Documents in the approximate aggregate principal amount of $7,554,868 (such principal amounts, together with all interest, fees, costs, expenses (including, without limitation, attorneys', accountants' and financial advisors' fees), and other amounts heretofore or hereafter accruing thereon or at any time chargeable to the Borrower in connection with the Prepetition Loan Documents, is collectively referred to herein as, the "Prepetition Indebtedness").

5.      The Debtors represent, stipulate, acknowledge, and agree that the Prepetition Indebtedness is (i) legal, valid, binding, and enforceable against the Borrower; and (ii) not subject to any contest, objection, recoupment, defense, counterclaim, offset, claim of subordination, claim of re-characterization, claim of avoidance of any nature, attack, or challenge under the Bankruptcy Code, other applicable non-bankruptcy law, equity, or otherwise.

6.      In connection with the execution of the Prepetition Loan Documents, Southern Texas Oil Company, STO Operating Company, STO Properties LLC and STO Drilling Company (collectively, the "Guarantors") provided a guaranty of the Borrower's full and prompt

payment of its indebtedness, liabilities, and obligations to the Prepetition Lenders. In connection therewith, each of the Guarantors executed that certain Guaranty dated as of April 1, 2008 and that certain Guaranty dated September 19, 2008 (collectively, as the same may be amended, restated, supplemented, or otherwise modified, the "Guaranties") in favor of Summerline Asset Management, LLC, as agent ( as successor in interest via assignment from Viking Asset Management, LLC solely in its capacity as collateral agent, the "Agent"), for the benefit of Agent and the Prepetition Lenders. By execution of the Interim Order, each of the Guarantors (i) reaffirms, ratifies, and confirms that the Guaranties, and the Guarantors' obligations thereunder, remain in full force and effect notwithstanding, among other things, any financial accommodations extended by the Prepetition Lenders to any of the Debtors pursuant to the terms of this Interim Order; (ii) denies and waives the existence of any defenses or right of setoff which may otherwise be available to the Guarantors relating to the Guaranties; and (iii) waives and releases any and all of the Guarantors' claims, counterclaims, and causes of action that may exist under the Guaranties against the Prepetition Lenders.

7. As security for the payment of the Prepetition Indebtedness, the Debtors represent, stipulate, acknowledge, and agree that the Debtors granted to the Agent for the benefit of the Prepetition Lenders, pursuant to, *inter alia*, the Amended and Restated Security Agreement dated April 1, 2008, Security Agreement dated September 19, 2008, Mortgages dated April 1, 2008, Mortgages dated September 19, 2008, Pledge Agreement dated April 1, 2008, and Pledge Agreement dated September 19, 2008, in each case, as the same is amended, restated, supplemented, or otherwise modified from time to time, security interests in and liens upon all of the Debtors' property and assets as more fully described in the Prepetition Loan Documents (all such property, as the same existed on or at any time prior to the Petition Date, together with all

cash and non-cash proceeds thereof, being hereinafter referred to as, the "Prepetition Collateral" and such liens thereon shall be referred to as the "Prepetition Liens").

8.     The Debtors represent, stipulate, acknowledge, and agree that the Prepetition Liens are legal, valid, enforceable, non-avoidable, and duly perfected security interests in and liens upon the Prepetition Collateral and, as of the Petition Date, and without giving effect to this Interim Order, the Debtors are not aware of any liens or security interests having priority over the Prepetition Liens, except certain "Permitted Liens" (as defined in the Prepetition Loan Documents) to the extent such Permitted Liens are legal, valid, enforceable, non-avoidable, duly perfected, and have priority pursuant to applicable non-bankruptcy law.  The Debtors further represent, stipulate, acknowledge, and agree that the Prepetition Liens in the Prepetition Collateral were granted to the Agent for the benefit of Agent and the Prepetition Lenders for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of the loans and financial accommodations secured thereby.

9.     Pursuant to that certain Intercreditor Agreement dated as of September 19, 2008, (as at any time amended, restated, modified, or supplemented, the "Intercreditor Agreement"), the parties set forth the relative priorities among to the Debtors' property and assets, including, without limitation, the Prepetition Collateral.

10.    All cash of the Debtors wherever located on the Petition Date represents either proceeds of loans from the Prepetition Lenders or proceeds of the Prepetition Collateral. Pursuant to the Prepetition Loan Documents and section 552(b) of the Bankruptcy Code, the Debtors represent, stipulate, acknowledge, and agree that the Agent on behalf of the Prepetition Lenders has a valid, duly perfected, first-priority lien upon and security interest in and to all of

the cash of the Debtors, and these funds, along with the proceeds of the Prepetition Collateral, constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code.

11.     On information and belief, the Prepetition Lenders do not oppose this Motion. The DIP Lender (as defined hereafter) is Giddings Investments LLC, which is not an existing lender to the Debtors.

## IV.     RELIEF REQUESTED

A.     By this Motion, the Debtors request entry of interim and final orders authorizing them to borrow from Giddings Investments LLC (or affiliates thereof) which currently are not lenders to the Debtors (the "DIP Lender") among other things in accordance with the Term Sheet which summarized (the "Dip Facility") (To the extent there is a conflict between the Term Sheet and the Motion, the DIP loan Definitive Agreement shall control. All the terms not defined in the Motion shall be defined as set forth in the Term Sheet.) as follows:

Subject to the terms and conditions set forth in the Term Sheet, a copy of which is attached hereto as Exhibit "A" and incorporated herein for all purposes (in the event of any conflict between the Term Sheet and this Motion, the terms and conditions set forth in the Term Sheet shall control), Giddings Investments LLC is willing to provide the following Terms and Conditions pursuant to which Giddings Investments LLC or an affiliate (collectively, "Glenrose'") will provide a commitment for up to $1.5 million in Debtor in Possession Financing ("DIP") to be provided to STXX, as further described below. The conduct of the parties hereunder shall be governed by a commercially reasonable standard. The parties agree and acknowledge that the terms and conditions set forth in the Term Sheet are in each instance subject to approval by the U.S. Bankruptcy Court. STXX agrees to support the DIP in the proceedings of the U.S. Bankruptcy Court on an exclusive basis.

| Borrower: | South Texas Oil Company and all operating subsidiaries, including but not limited to Southern Texas Oil Company, STO Drilling Company, STO Operating Company, and STO Properties, LLC ("STXX or Borrower"). |
|---|---|
| Lender: | Giddings Investments LLC or designated affiliate thereof ("Glenrose" or "Lender"). |

Properties: The following described assets, properties, rights, titles and interests (herein collectively called the "Properties") include: All Borrower's producing and non- producing oil, liquids, natural gas, and well bores for which the reserve report dated 9/23/09, 2:20:02 PM reflecting reserves as of 9/1/09 as previously delivered to Giddings and Summerline by STXX (the "Reserve Report"), represents substantially all of such assets; areas of mutual interest, mineral leases, mineral fees, surveys, title work and opinions; royalty, overriding royalty, reversionary, working, net profits, and net revenue interests; production payments; and well locations, equipment, contracts, and any similar asset owned by Borrower on developed and undeveloped acreage that includes, but is not limited to Texas and Louisiana, and any other assets including, but not limited to, cash, accounts receivable, prepaid expenses, and other similar assets.

DIP Financing: Giddings shall provide Debtor in Possession ("DIP") financing in the amount of $1,500,000 under the following terms:

(1) Senior Secured with a court approved first lien on all Properties;

(2) Option of either (a) One-month LIBOR plus 7% per annum or (b) Prime plus 4.375%, with a minimum per annum rate of 10%, payable monthly ("Interest Rate") [now a fixed 10% per annum rate];

(3) January 31, 2010 bullet maturity at par and may be repaid, whole or in part, at any time at par plus accrued and unpaid interest;

(4) G&A will be subject to court approval;

(5) For as long as the DIP remains outstanding, STXX without Glenrose's prior written consent, shall not make any drilling capital expenditures unless such capital expenditures are in the DIP Budget. In addition, STXX may not engage in any lease, property, corporate or other acquisitions without Glenrose's consent;

(6) Use of proceeds of the DIP shall exclude any and all Summerline Asset Management LLC ("Summerline") post petition claims that exceed $100,000 in the aggregate;

(7) Semi-annual updates to the Reserve Report, providing at least 3.5x coverage based on the PV10 of proved developed producing reserves, as set forth in the 12/31/08 reserve report with the first update being 12/31/09;

(8) Other covenants and restrictions customary for transactions of this nature, however, excluding cash flow based maintenance covenants.

Use of Proceeds: The proceeds shall be used to pay working capital needs of Borrower and to pay any costs associated with this financing in each case only to the extent approved by Giddings if and to the extent approval is required under the

Definitive Agreements and otherwise set forth in the budget ("DIP Budget" attached hereto as Exhibit "B") for Borrower approved by the U.S. Bankruptcy Court.

Default Rate: Upon the occurrence of an Event of Default, the Interest Rate shall be increased by 500 basis points. Mandatory Prepayments: Proceeds (net of customary and reasonable expenses) of issuances of equity or indebtedness, any insurance recoveries, and 100% of asset sale proceeds (net of customary and reasonable expenses) shall be applied to the DIP.

Closing Date: The DIP shall be provided upon approval thereof by the bankruptcy court.

Commitment Fee: 3% of the maximum of the DIP which fee shall be fully earned, non-refundable, and paid in full to the Lender from the proceeds of the DIP when provided to the Borrower.

Expenses and Indemnification: Lender shall be reimbursed for all reasonable direct and indirect costs, fees, and expenses ("Costs"), which shall be paid by Borrower at closing from proceeds of the DIP. Indemnification provisions customary for transactions of this type will be provided for in the definitive documentation. To the extent not already paid to Glenrose, upon your acceptance of the Term Sheet, a non-refundable deposit of $10,000 (the "Deposit") will be required. If the DIP does not close and the Deposit is less than Giddings's actual costs, then the Borrower shall pay such additional Costs upon request by Glenrose.

Confidentiality: The Term Sheet and all discussions relating to the Term Sheet shall be treated as confidential information and, except as may be required by applicable law or regulation and as specified in the US Bankruptcy Code, shall not be disclosed by either party to any other person or entity, except employees, officers, agents or representatives of a party who have a need to know for purposes of completing the transactions contemplated by the Term Sheet. Except to the extent permitted by the previous sentence, the Borrower will not otherwise disclose to any other person or entity the existence or purpose of this Term Sheet, the terms and conditions hereof, the fact that discussions are taking place.

Documentation: The transaction shall be in accordance with appropriate documents necessary to effect the transactions contemplated herein (collectively, the "Definitive Agreements"), all acceptable in form and substance to the parties and Summerline and their respective counsel. The parties agree to proceed diligently and use their reasonable efforts in good faith to negotiate the Definitive Agreements. The Definitive Agreements shall contain representations, warranties and indemnification provisions that are usual and customary for transactions of this type. Giddings's counsel will prepare the initial drafts of the Definitive Agreements.

Conditions
to Closing    Closing is subject to negotiation, execution, and delivery of the Definitive Agreements. Closing will also be conditioned upon the DIP being authorized pursuant to Section 364 and the liens securing the DIP ranking prior to all other claims and liens of Borrower. Execution and delivery of the Definitive Agreements, will be subject to satisfactory conclusion of appropriate due diligence by Giddings that shall include, without limitation, title, accounting, environmental, operational and engineering reviews with respect to the Properties however, excluding the assets set forth on Exhibit A attached to the "Term Sheet". Borrower will provide access to all technical and financial information at Lender's request. Subject to the satisfaction of all closing conditions (unless waived), the parties shall use commercially reasonable efforts to have the Closing as soon as practical following execution of the Term Sheet as allowed under the US Bankruptcy Code.

Binding Effect:    With the exception of the Expenses and Confidentiality obligations set forth herein, the provisions of this Section which are all binding obligations, the parties do not intend that this Term Sheet or the negotiations related to the Term Sheet result in any legally binding rights or obligations on either party. Accordingly, neither party acquires any other right, obligation or interest by reason of this Term Sheet or the previous or continuing discussions, including without limitation, any obligation to negotiate or enter into any Definitive Agreements.

Law Governance:    This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of New York and the laws of the United States of America.

Miscellaneous:    All notices shall be deemed to be delivered, if in writing, upon the earlier of actual receipt by the party to be notified or 3 days after deposit in the mail, postage prepaid, return receipt requested, certified or Federal Express, addressed as follows:

If to Lender:    Giddings Investments LLC
3 Parklands Dr Suite 102
Darien, CT 06820
Tel: (203) 202-7525
Fax No.: (203) 930-2825
Attention: Grew. Imbruce
With a copy to: greagalenrosecap.com

If to Borrower:    South Texas Oil Company, Inc.
300 East Sonterra Boulevard Suite 1220
San Antonio, TX 78258
Attention: Michael Pawelek
Tel: (210) 545-5994

Fax No.: (210) 545-3317

With Copies to Counsel for Debtors:

> Ronald Hornberger
> Plunkett & Gibson, Inc.
> Ste 1100, 70 N. E. Loop 410
> San Antonio, Tx 78216
> Tel: (210) 734-7092
> Fax: (210) 734-0379

And to

> David S. Gragg
> Langley & Banack, Incorporated
> Suite 900, Trinity Plaza II
> 745 East Mulberry
> San Antonio, TX 78212-3166
> Telephone: (210)-736-6600
> Fax: (210) 735-6889

B.     Further, Debtors request that Debtors be permitted and that the Court grant its approval for the following:

1.     That Debtors be permitted to obtain from DIP Lender credit advances in an aggregate principal sum of (i) up to $500,000 upon entry of the Interim Order and (ii) following the entry of the Final Order, up to the same total sum of $1,500,000 (the DIP Facility contemplates a total DIP loan of $1,500,000) plus accrued interest on the aggregate principal amount on a revolving credit basis, to (V) pay the fees, costs, expenses, and disbursements of professionals retained by the Debtors or any creditors committees appointed in these chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (hereinafter, the "Committee") and to pay the costs and expenses of members of the Committee as approved by the Court, and bankruptcy related charges all as allowed by the Court including United States Trustee and Clerk Fees; (W) to fund general corporate purposes relating to post-petition operations; (X) to pay (a) all fees due to DIP Lender as provided under the DIP Facility and (b) all professional fees and

expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the DIP Lender, including those incurred in connection with the preparation, negotiation, documentation and court approval of the DIP Facility (whether incurred before or after the date of the commencement of the Cases); (Y) to repay certain other prepetition claims as may be permitted by the Bankruptcy Court pursuant to "first day" orders, if any, satisfactory to the DIP Lender; and (Z) to provide for ongoing debtor-in-possession working capital needs and capital expenditures.

2.      that the obligations of the Debtors under the DIP Facility (i) be secured by a first priority priming lien on any and all assets of the Debtors that secure the obligations under the Existing Facilities pursuant to section 364(d); (ii) pursuant to section 364(c)(1) of the Bankruptcy Code be entitled to exclusive super priority administrative expense status in the Cases, (iii) pursuant to section 364(c)(2) of the Bankruptcy Code be secured by a first priority perfected security interest in all of Debtors' and each other obligor's and guarantor's unencumbered assets, including all real and personal property, whether now owned or hereafter acquired, and upon entry of a final order, the proceeds of any avoidance actions of Debtors under sections 544, 545, 547 through 551 and 553 of the Bankruptcy Code, (iv) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on any specific property of Debtors and each other obligor and guarantor that is subject to valid, perfected and non-avoidable liens (other than liens arising under the Existing Facilities), which liens shall be identified on a schedule to the DIP Facility prepared by Borrower's restructuring advisor which shall specify, among other things, the specific property to which each such lien relates; and (v) DIP Lender' security interest under section 364(d), shall only be subject to the Carveout and amounts required to be paid by Debtors to the United States Trustee during the term of the Interim Order and Final Order. Additionally, upon

entry of a final order approving the Motion, the Debtors shall waive any and all rights to surcharge the DIP Lender under section 506(c) of the Bankruptcy Code.

      c.     under Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") be held before this Court to consider entry of the Interim Order approving the post-petition financing facility on an interim basis and authorizing the Debtors to obtain, on an interim basis, under the DIP Facility, a sum not to exceed $500,000 pursuant to the terms and conditions of the Interim Order (to the extent there is a conflict between the Term Sheet and the Interim Order, the Interim Order shall control) and further requesting the setting of a final hearing on this Motion (the "Final Hearing") and establishing notice procedures in respect of the Final Hearing, for this Court to consider entry of the Final Order authorizing the Post-petition Financing.

## V.    **AUTHORITIES AND ARGUMENT**

**A.**    **Debtor-in-Possession Financing**

    1.     Senior Lien on Collateral of Existing Lenders

    a.     Section 364(d) of the Bankruptcy Code provides that a debtor may obtain post-petition financing by granting a lien on property of the estate that is senior or equal to liens that already exist on such property, so long as the debtor provides adequate protection of the previous lienholders interest in such property. *In re Swedeland Development Group, Inc.,* 16 F.3d 552, 564 (3d Cir. 1994)(debtor must provide adequate protection to pre-petition secured creditor in order to obtain post-petition super priority financing); *In re Crouse Group, Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)(debtor must establish that the credit transaction is necessary to preserve the estate and the terms of the transaction are fair and reasonable).

Prepetition Lenders consent to the DIP Facility and the super priority liens contemplated by it.

  b.    Section 364(d) of the Bankruptcy Code provides:

> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if —
>
>> (A)  the trustee is unable to obtain such credit otherwise; and
>> (B)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

  c.    The Debtors satisfy the requirements of section 364(d) of the Bankruptcy Code as the Debtors are unable to obtain credit otherwise, the Prepetition Lenders have consented to the DIP Facility, and the proposed financing is in the best interest of the estates. The Debtors seek to grant a senior lien upon the collateral of the Prepetition Lenders. There may be mineral contractors and sub-contractors who hold valid and enforceable statutory liens. Debtors seek authority that the liens granted to the DIP Lender will be senior in priority and thus "Prime" any and all existing liens including, without limitation, M&M Liens. Any other parties that may have a lien on other property of the estates are not affected by the interim request for a senior or equal lien which is to be granted to the DIP Lender. Furthermore, as will be demonstrated below, the Prepetition Lenders will be provided additional adequate protection during both the Interim Period and the entirety of the Cases by virtue of the Debtors' ability to better protect and even to enhance the value of the Prepetition Lenders' collateral.

## B.    Debtors are Unable to Obtain Comparable Alternative Credit

In the weeks leading up to the Petition Date, the Debtors undertook substantial

negotiations with different potential debtor-in-possession financing lenders, including the Agent. Although the Debtors attempted to reach favorable term sheets with each potential lender, they were unable to develop agreements comparable to the proposed DIP Facility in the time available.

## C.     Prepetition Lenders have agreed to the DIP Facility

1.      The Prepetition Lenders have agreed to the DIP Facility.

2.      Additionally, the Prepetition Lenders are adequately protected under the proposed DIP Facility (and previously have consented to the use of cash collateral) by the maintenance and potential increase in the value of their collateral, which will flow directly from the use of the DIP Facility funds. In *In re 495 Central Park Avenue Corp.*, the court considered whether the debtor could obtain debtor-in-possession financing under section 364(d) by granting a super priority security interest over the objections of existing secured parties. *In re 495 Central Park Avenue Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992). The funds were to be used to improve the debtor's primary asset, certain real property. *Id.* The court was presented evidence that the improvements made to the property would increase its value. *Id.* at 628-630. The court found that there was "substantial evidence that both prongs of 11 U.S.C. § 364(d) have been satisfied." *Id.* at 630. Specifically, the court found that the "broad and flexible definition" of adequate protection was satisfied. *Id.* at 631. The court stated that it "must consider whether the value of the debtor's property will increase as a result of the renovations funded by the proposed financing." *Id.* at 631. The court found that "there is no question that the property would be improved by the proposed renovations and that an increase in value will result." *Id.* at 631. Just as in *495 Central Park,* the Debtors propose to utilize the DIP Facility to improve the value of

their real property assets. In part, the DIP Facility will be used to maintain and retain the existing leases of the Debtors. Without the use of the DIP Facility, the Debtors will not be able to maintain much less improve their assets. To the extent the Prepetition Lenders have valid liens on such leases and any acreage retained or acquired by Debtors after the commencement of these cases the Prepetition Lenders will benefit. Just as in *495 Central Park,* "a substitution occurs in that the money spent for improvements will be transferred into value. This value will serve as adequate protection" for the existing secured lender. *Id.* at 631. Without the expenditure of the funds, the value of any such collateral will be sacrificed as leases expire. *See also, In re Plabell Rubber Products, Inc.* 137 B.R. 897 (Bankr. N.D. Ohio 1992) (stating that "an increase in the value of the collateral generated by the improvements resulting from the super priority financing could constitute adequate protection"); *In re Yellowstone Mountain Club, LLC,* 2008 WL 5875547 (Bankr. D. Mont. Dec. 17, 2008) (finding adequate protection existed for primed secured party, because it preserved the debtor's going concern value).

3.      In addition to the adequate protection discussed in above, the Debtors will also provide continued adequate protection in the form of payments of interest at the contract (non-default rate) to the Prepetition Lenders and reimbursement of fees and expenses, post-petition.

4.      As it is unlikely that the Prepetition Lenders are fully secured, much less have an equity cushion, in addition to the adequate protection offered above, the Prepetition Lenders also are being offered replacement liens on all assets of the Debtors to the extent the Prepetition Lenders are able to establish that they have suffered a diminution in value of their interests in the Pre-Petition Collateral.

5.      ***NOTICE***: The proposed DIP Lender, Giddings Investments LLC has advised the

Debtors that it may make an offer to purchase some of the Debtors' assets.

**D.      The Proposed DIP Facility is the Best Interest of the Debtors' Estates and Creditors**

1.      The proposed DIP Facility is required to preserve and maintain the Debtors' going concern value and is, therefore, in the best interest of the Debtors' estates and creditors. The availability of credit under the DIP Facility is necessary to provide working capital for the Debtors to continue to operate their businesses and afford the Debtors' vendors and customers the necessary confidence to continue ongoing relationships with the Debtors, including the extension of credit terms for the payment of goods and services. The DIP Facility will be viewed favorably by the Debtors' employees, minimize disruption to the Debtors' businesses and ongoing operations, and avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

2.      In the Debtors' business judgment, the DIP Facility represents the best financing option to effectuate these purposes and advance the Debtors' reorganization efforts. The terms of the DIP Facility neither (a) tilt the conduct of these Cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits.

3.      Likewise, the various fees and charges required under the DIP Facility are reasonable and appropriate under the circumstances. Courts routinely have authorize similar lender incentives that extend beyond the specific liens and rights specified in Bankruptcy Code section 364. *See R. T.C. v. Official Unsecured Creditors Committee* (*In re Defender Drug Stores, Inc.*), 145 B.R. 312, 316-318 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to section 364 that included a lender "enhancement fee").

4.    Although, since the Prepetition Lenders have agreed to the DIP Loan and the provisions for superior liens to the DIP Lender there should be no need for further findings by the Court. However, the courts in the Western District of Texas previously have granted the relief requested by the Debtors under section 364(d) in other cases. See *In re Spectrum Jungle Labs Corp.*, Case No. 09-50455-rbk (Bankr. W.D. Tex (San Antonio) March 5, 2009) (Docket No. 229); *In re Physicians Specialty of El Paso East, L.P.,* Case No. 07-30633-lmc (Bankr. W.D. Tex. (El Paso) Oct. 24, 2007) (Docket No. 238).

**E.    Additional Liens on Unencumbered Assets or Second Liens**

1.    Pursuant to section 364(c) of the Bankruptcy Code, a debtor may also in the exercise of its business judgment, incur secured debts on the unencumbered assets of the debtor or junior liens on encumbered assets, if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates. *See, e.g., In re Simasko Production Co.,* 47 B.R. 444, 448-9 (Bankr. D. Colo. 1985)(authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores,* 115 B.R. at 38 (with respect to post petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.")

2.    Section 364(c) of the Bankruptcy Code provides:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt-

(1)  with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)  secured by a junior lien on property of the estate that is subject to a lien.

3.     The Debtors have been unable to procure the required funds in the form of unsecured credit or unsecured debt with an administrative priority. On an interim basis, the DIP Lender will not have a lien upon the proceeds from causes of action arising under sections 544, 545, 547 through 551 and 553. The Debtors seek authority to grant such a lien pursuant to a final order on the Motion. Accordingly, under the circumstances, the Debtors should be authorized to enter into a secured financing arrangement under section 364(c) of the Bankruptcy Code.

4.     Having determined that financing was available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Facility at arm's length and pursuant to their business judgment, which is to be accorded great weight so long as it does not run afoul of the provision of and policies underlying the Bankruptcy Code. *See, e.g., Bray v. Shenandoah Federal Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986)(approving debtor-in-possession financing necessary to sustain seasonal business); *In re Ames Dep't Stores*, 115 B.R. at 40 (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.").

5.     In satisfying the standards of section 364(c) and (d) of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. *In re Snowshoe Co.*, 789 F.2d at 1088 ("the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). Instead, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of

the essence' nature of this type of financing." *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In *In re Sky Valley, Inc.*, 100 B.R. 107, 112-13 (Bankr. N.D. Ga. 1988), the Court stated that "it would be unrealistic and unnecessary to require Debtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the Debtors' approach of only four lenders was sufficient under such circumstances.

6.     The DIP Facility is clearly for the benefit of the Debtors' estates and creditors. As set forth above, it is critical to maintaining the Debtors' operations and leases and, thus, preserving and enhancing the Debtors' going concern value. As evidenced by the Budget (attached hereto as Exhibit B), use of cash collateral alone is insufficient to pay even the normal operating expenses after the adequate protection payments are made to the Revolver Lenders. With the additional liquidity provided by the DIP Facility, the Debtors will be able to preserve leases, obtain goods and services in connection with maintaining ongoing operations on normal credit terms, thereby permitting them to generate revenues, pay their employees, and operate their businesses for the benefit of all parties in interest.

7.     The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at an arm's length. Accordingly, the DIP Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Facility.

8.     The courts in the Western District of Texas have previously granted the relief requested by the Debtors under section 364(c) in other cases. *See In re Spectrum Jungle Labs Corp.*, Case No. 09-50455-rbk (Bankr. W.D. Tex (San Antonio) March 5, 2009) (Docket No.

229); *In re Physicians Specialty of El Paso East, L.P.,* Case No. 07-30633-lmc (Bankr. W.D. Tex. (El Paso) Oct. 24, 2007) (Docket No. 238); *In re LUH Resort, Ltd.,* Case No. 07-70143-cag (Bankr. W.D. Tex (Midland) Oct. 10, 2007) (Docket No. 202); *In re Lothian Oil Inc.,* Case No. 07-70121-rbk (Bankr. W.D. Tex (Midland) July 17, 2007) (Docket No. 176).

**F.      Approval of Modification of the Automatic Stay**

1.      Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition. The DIP Facility contemplates that the DIP Lender shall have a first priority lien on the collateral of the Prepetition Lenders and on any unencumbered assets of the Debtors. To the extent necessary, the DIP Lender should be granted relief from the automatic stay to perfect such interests.

2.      Stay modification provisions of this kind are ordinary and standard features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order.

**G.      The Interim Approval Should Be Granted**

1.      As mentioned above, Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 may not be commenced earlier than 15 days after service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize obtaining credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.

2.     On an interim basis, the Debtors request that this Court authorize the Debtors to borrow and use up to $500,000 of the total contemplated amount of the proposed DIP facility of $1,500,000. The Debtors must have the interim relief requested in order to operate their business and protect their assets and the value of their assets. Absent the interim relief, the Debtors will be unable to meet their payroll obligations and operations will cease.

3.     The Debtors request, pursuant to Bankruptcy Rule 4001(c), that the Court authorize the Debtors, from and after the entry of the Interim Order until an order is entered following the Final Hearing on the Motion, to obtain credit under the DIP Facility. This will enable the Debtors to maintain ongoing operations and the means by which they may avoid immediate and irreparable harm and prejudice to their estates and all parties-in-interest, pending the Final Hearing.

## VI.     NOTICE

**A.     Notice With Respect to Interim Cash Collateral**

1.     Notice of this Motion has been given by facsimile or overnight delivery to the following parties, or in lieu thereof, to their counsel: (i) the DIP Lender and their counsel; (ii) office of the United States Trustee for the Western District of Texas, Austin Division and San Antonio Division; (iii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iv) certain governmental entities, counsel and parties-in-interest, including the Petitioning Creditors in the Involuntary Chapter 7 case filed on September 11, 2009 in the Austin Division of the Western District of Texas, case No. 09-12573-cag; and (v) the Prepetition Lenders and their counsel. The Debtors submit that under the circumstances, no

further notice of the hearing on the interim financing is necessary and request that any further notice be dispensed with and waived.

**B.    Notice With Respect to Final Cash Collateral**

39.    The Debtors respectfully request that the Court set a final hearing date on the Motion for  November 17 , 2009 at 9:30 a.m. (Central Time), or as soon thereafter as possible on the Court's Docket, and authorize the Debtors to serve a copy of this Motion and any interim order which fixes the time and date for filing objections to this Motion, by first class mail upon (i) counsel to any official committee of unsecured creditors appointed in these cases; (ii) the Office of the United States Trustee, San Antonio Division; (iii) all parties who have filed requests for notice under Bankruptcy Rule 2002; (iv) the thirty (30) largest unsecured creditors (on a consolidated basis) of the Debtors at their last known addresses; (v) the DIP Lender and their counsel; (vi) the Prepetion Lenders and their counsel; (vii) all parties who have asserted liens on assets of the Debtors; and (viii) all other parties ordered by the Court. The Debtors request that the Court deem such notice of the final hearing to be sufficient notice under 11 USC § 102 and under Bankruptcy Rule 4001.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## VII. PRAYER

WHEREFORE, the Debtors respectfully request that the Court enter an Order (a) authorizing, on an interim basis, and pursuant to the terms and conditions outlined in this Motion, the Interim Order and the Term Sheet and Budget, the Debtors' to borrow up to $500,000 under the DIP Facility from the DIP Lender; (b) scheduling the Final Hearing on this Motion for approval of the DIP Facility on a final basis; (c) authorizing, on a final basis, the Debtors' to borrow up to $1,500,000 under the DIP Facility from the DIP Lender; and (d) for such other and further relief to which the Debtors may be justly entitled.

Dated: November 12, 2009

Respectfully submitted,

| | AND |
|---|---|
| RONALD HORNBERGER<br>PLUNKETT & GIBSON, INC.<br>Renaissance Plaza, Suite 1100<br>70 NE Loop 410<br>San Antonio, TX 78216<br>Telephone: (210) 734-7902<br>Telecopier: (210) 734-0379<br>E-mail: hornbergerr@plunkett-gibson.com | DAVID S. GRAGG<br>LANGLEY & BANACK, INCORPORATED<br>Suite 900, Trinity Plaza II<br>745 East Mulberry<br>San Antonio, TX 78212-3166<br>Telephone: (210)-736-6600<br>Fax: (210) 735-6889<br>E-mail: dgragg@langleybanack.com |

By: _____
RONALD HORNBERGER
Texas Bar No. 10004000
DAVID S. GRAGG
Texas Bar No. 08253300

**PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION**

## CERTIFICATE OF CONFERENCE

I hereby certify that, November 12, 2009, the undersigned counsel for the Debtors conferred with counsel to the Pre-Petition Lenders and with the United States Trustee regarding the foregoing Motion for authority to enter into Debtor in Possession borrowing.

David S. Gragg

_____

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, and 507 and Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014 (I) Authorizing the Debtors to Incur Postpetition Senior Secured Superpriority Indebtedness; (II) Granting Security Interests and Superpriority Claims and Granting Adequate Protection; (III) Scheduling a Final Hearing on the Motion* was forwarded to those parties listed on the attached Service List.

_____
David S. Gragg